**CONSOLIDATED EDISON, INC.,**
Plaintiff/Counterclaim
Defendant

v.

**NORTHEAST UTILITIES,**
Defendant/Counterclaim
Plaintiff/Crossclaim Plaintiff,

and

**Robert Rimkoski, individually and on behalf of all others similarly situated,** Intervenor    Defendant/Counterclaim Plaintiff/Crossclaim Defendant.

No. 01 Civ. 1893(JGK).

United States District Court,
S.D. New York.

May 15, 2004.

See, also, 2004 WL 35445.

New York, NY. Kenneth M. Kramer, Shearman & Sterling, L.L.P., New York, NY. Stuart J. Baskin, Shearman & Sterling, L.L.P., New York, NY.

For Northeast Utilities, A Massachusetts business trust, Defendant: Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, NY. Joseoh N. Sacca, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY. John Gueli, Shearman & Sterling LLP (New York), New York, NY. Kenneth M. Kramer, Shearman & Sterling, L.L.P., New York, NY. Stuart J. Baskin, Shearman & Sterling LLP (New York), New York, NY.

For Northeast Utilities, Counter Claimant: Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, NY. Joseph N. Sacca, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY.

For Consolidated Edison, Inc., Counter Defendant: John Gueli, Shearman & Sterling LLP (New York), New York, NY. Kenneth M. Kramer, Shearman & Sterling, L.L.P., New York, NY. Stuart J. Baskin, Shearman & Sterling, L.L.P., New York, NY.

For Robert Rimkoski, Movant: Ira A. Schochet, Goodkind, Labaton, Rudoff & Sucharow, L.L.P., New York, NY. Lawrence A. Sucharow, Goodkind Labaton Rudoff & Sucharow LLP, New york, NY. Lisa Buckser-Schulz, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY.

For Northeast Utilities, A Massachusetts business trust, Cross Claimant: Joseph N. Sacca, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY. Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom (DC), Washington, DC.

For Robert Rimkoski, Cross Defendant: Lisa Buckser-Schulz, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY. Ira A. Schochet, Goodkind, Labaton, Ru-

---

Counsel: For Martin Siegel, Movant: Richard B. Brualdi, Law Offices of Richard B. Brualdi, New York, NY.

For Consolidated Edison, Inc., a New York corporation, Plaintiff: John Gueli, Shearman & Sterling LLP (New York),

doff & Sucharow, L.L.P., New York, NY. John Gueli, Shearman & Sterling LLP (New York), New York, NY. Kenneth M. Kramer, Shearman & Sterling, L.L.P., New York, NY. Lawrence A. Sucharow, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY. Stuart J. Baskin, Shearman & Sterling LLP (New York), New York, NY.

### OPINION and ORDER

KOELTL, District Judge.

This case arises out of the failed multibillion dollar merger between Consolidated Edison, Inc. ("Con Ed") and Northeast Utilities ("NU") that has been the subject of two prior opinions by this Court. *See Consol. Edison, Inc. v. Northeast Utils.,* 249 F.Supp.2d 387 (S.D.N.Y.2003); *Consol. Edison, Inc. v. Northeast Utils.,* No. 01 Civ. 1893, 2004 WL 35445 (S.D.N.Y. Jan.7, 2004). As part of the agreement between Con Ed and NU, Con Ed agreed to purchase all outstanding NU shares at a substantial premium over the market price, but shortly before the merger was to be completed, Con Ed announced that it would not proceed. Con Ed then brought this action, in which it seeks a declaratory judgment that it has no obligations under the Merger Agreement.

NU has counterclaimed arguing that Con Ed repudiated and breached the Agreement. While seeking certain expenses on behalf of itself as a corporation, NU is also pursuing a so-called "lost premium" on behalf of its current and future shareholders as third-party beneficiaries of the Merger Agreement. Robert Rimkoski ("Rimkoski") has intervened as a defendant and is also suing Con Ed for breach of contract. *See Consol. Edison,* 2004 WL 35445. Rimkoski claims that he is entitled to damages because he was an NU shareholder on March 5, 2001, the date of Con Ed's alleged breach of the Merger Agreement. He also seeks to represent a class of similarly situated individuals who owned NU shares on March 5, 2001.[1] While the Court has previously ruled that NU shareholders are third-party beneficiaries under the Merger Agreement, *see Consol. Edison,* 249 F.Supp.2d at 416–17, it has not yet determined which shareholder class has the right to pursue the third-party beneficiary claim based on the merger premium.

There are now two motions pending before this Court that concern the same issue: Does the third-party beneficiary claim belong to those who held NU shares at the time of Con Ed's alleged breach on March 5, 2001 (the "proposed March 5 Class" that Rimkoski seeks to represent), or to those who are holding NU shares at the time that a judgment against Con Ed is entered, collected, or distributed (the "Judgment Class"[2] that NU seeks to represent)? The legal question presented by these motions is one of first impression and is essentially this: Where shareholders are third-party beneficiaries of a contract between the corporate issuer of the stock and a third party, is the right to sue that third party for breach of the contract automatically transferred to a subsequent purchaser of the stock?

---

1. After the Court granted Rimkoski's motion to intervene, Rimkoski filed a motion to certify a class of those who held NU stock at the time of Con Ed's alleged breach. All parties, however, have agreed that in the interests of judicial economy, the Court should first determine whether Rimkoski has the right to pursue his alleged claim.

2. While this Opinion refers to a "Judgment Class" in accordance with the parties' terminology, that group is not a formal class but simply those current and future shareholders on whose behalf NU is seeking to obtain the merger premium.

After filing a crossclaim for declaratory judgment against Rimkoski, NU has moved pursuant to Federal Rule of Civil Procedure 56(i) for summary judgment in its favor on the crossclaim on the grounds that Rimkoski, a former shareholder, assigned his rights to pursue a claim against Con Ed when he sold his shares. Pursuant to Rules 12(b)(6) and 12(c), Con Ed has renewed a motion to dismiss NU's counterclaim against it for the "lost premium," agreeing with Rimkoski that only those who held NU shares at the time of the alleged breach should have the right to sue Con Ed for such damages.

## I.

While the two motions are a motion to dismiss and a motion for summary judgment, the parties agree that no material facts are in dispute, and both motions turn solely on the same legal question of whether the right to sue Con Ed was automatically transferred from Rimkoski and those shareholders who owned NU stock on March 5, 2001 to subsequent purchasers of the NU shares whom NU seeks to represent.[3] While familiarity with the prior decisions is assumed, the facts and procedural history are presented to the extent necessary for the current motions. As explained in the prior decisions, the basis for jurisdiction in this case is diversity pursuant to 28 U.S.C. § 1332, and there is no dispute that New York state law applies. *See Consol. Edison*, 249 F.Supp.2d at 391, 399.

On October 13, 1999, Con Ed and NU executed the Merger Agreement whereby Con Ed would purchase all outstanding NU shares for an expected price of $26.50 per share. *See id.* at 395; (NU's Local Rule 56.1 Statement of Material Facts Not in Dispute ("NU Rule 56.1 Stmt.") ¶ 1.).[4] The anticipated merger price represented a premium of more than forty percent over the "unaffected" price of $18.56 per share at which NU shares were trading before rumors of the merger began circulating in the market. *See Consol. Edison*, 249 F.Supp.2d at 395. The aggregated premium constituted more than $1 billion of the total $3.6 billion that Con Ed expected to pay for NU's 137 million then-outstanding shares. *Id.* Under the Merger Agreement, Con Ed was to pay NU shareholders the merger price at the "Effective Time"— namely, the closing—in exchange for the surrender of their NU common stock certificates. (*See* NU Rule 56.1 Stmt. ¶ 3 (citing Merger Agreement §§ 2.01, 2.04).) Because NU and Con Ed needed to obtain approval from numerous state and federal regulatory agencies, the closing was not expected to occur until Spring 2001. (*See id.* ¶ 2.)

On March 5, 2001, shortly before the merger was expected to close, Con Ed announced that it would not proceed with the merger. Con Ed then filed this lawsuit for a declaratory judgment relieving it of obligations under the Agreement. The complaint asserted, among other things, that NU fraudulently induced Con Ed to enter into the Merger Agreement, that NU breached various provisions of the Agreement, and that certain conditions precedent had failed. NU counterclaimed for breach of contract seeking to recover

---

**3.** Rimkoski, in his Response to NU's Local Rule 56.1 Statement of Material Facts Not in Dispute, agreed that there are no genuine issues of material fact to be tried in connection with the motion for summary judgment, although Rimkoski did dispute certain of NU's assertions that are not material.

**4.** Excerpts from the Amended and Restated Agreement and Plan of Merger ("Merger Agreement"), dated as of October 13, 1999, and amended and restated as of January 11, 2000, is attached as Ex. 1 to Decl. of Douglas M. Kraus in Supp. of Northeast Utilities' Mot. for Summ. J. Against Crosscl. Def. Robert Rimkoski ("Kraus Decl.").

approximately $27 million expended to obtain various regulatory permits necessary for the merger. In addition, NU sought to recover $1.2 billion based on the "lost premium" that would have been paid to NU shareholders.

Con Ed and NU filed cross-motions for partial summary judgment, and in an Opinion and Order dated March 21, 2003, this Court denied Con Ed's motion and granted NU's motion in part, thereby dismissing some of the claims against NU. *See generally Consol. Edison,* 249 F.Supp.2d 387. In that decision, the Court ruled that NU shareholders were intended third-party beneficiaries under Section 8.06 of the Merger Agreement, and that NU, as a promisee, had standing to sue on behalf of its shareholders. *Id.* at 416–17. The decision, however, did not address whether current or former shareholders were the appropriate third-party beneficiaries.

Following that decision, Con Ed filed a motion to dismiss arguing that only NU shareholders at the time of the alleged breach had the right to sue Con Ed for damages and that NU had no standing to sue on behalf those shareholders. While that motion was being briefed, a motion to intervene was filed by Rimkoski, who had held NU shares on March 5, 2001, the date of the alleged breach, and sold most of them shortly thereafter. Prior to seeking intervention, Rimkoski had filed a suit in the New York State Supreme Court, New York County against Con Ed on behalf of a prospective March 5 Class. *See Rimkoski v. Consol. Edison, Inc.,* No. 03/109095 (N.Y. Sup.Ct. filed May 16, 2003); (NU Rule 56.1 Stmt. ¶¶ 9–11.) NU opposed the motion to intervene on the grounds that Rimkoski, as a former shareholder, had no standing because the right to sue for breach contract passed with the NU stock to subsequent purchasers. Con Ed's motion to dismiss and Rimkoski's motion to intervene thus raised the same dispute involved in the current motions.

The Court determined that this legal issue of first impression was best resolved after Rimkoski had been made a party in the case and after the parties had an opportunity to refine and focus their arguments. Therefore, in an Opinion and Order dated January 7, 2004, the Court granted Rimkoski's motion to intervene and denied Con Ed's motion to dismiss without prejudice to renewal. *See Consol. Edison,* 2004 WL 35445. Following the intervention, NU filed a crossclaim for declaratory judgment against Rimkoski, and NU now moves for summary judgment in its favor. Con Ed has renewed its motion to dismiss NU's counterclaim for the "lost premium."

### III.

As described, both motions concern whether Rimkoski and his proposed March 5 Class or NU on behalf of the Judgment Class has the right to the breach of contract claim against Con Ed. NU argues that the right of its shareholders to sue Con Ed as a third-party beneficiary to the Merger Agreement was automatically transferred or assigned to all subsequent purchasers of the NU shares.

Disputes between former and current security holders over the right to sue have arisen under federal law in the securities fraud context, where it is well established that only those individuals who relied on and were injured by the misleading acts or omissions may seek damages. *See, e.g., Bluebird Partners, L.P. v. First Fid. Bank,* 85 F.3d 970, 974 (2d Cir.1996) ("[F]ederal securities law claims are not automatically assigned to a subsequent purchaser upon the sale of the underlying security"); *In re Nucorp Energy Sec. Litig.,* 772 F.2d 1486, 1490 (9th Cir.1985); *Lowry v. Balt. & Ohio R.R. Co.,* 707 F.2d

721, 729–30 (3d Cir.1983); *cf. Lowry v. Balt. & Ohio R.R. Co.,* 629 F.Supp. 532, 533–34 (W.D.Pa.1986) (applying New York law and finding that securities fraud claims are not automatically transferred to subsequent purchasers). Disputes have also arisen between former and current securities holders over the right to receive claim proceeds held by a trust, and those cases have been decided based on the terms of the indenture agreements involved. *See U.S. Trust Co. of N.Y. v. Alpert,* 10 F.Supp.2d 290, 297–301, 303–04 (S.D.N.Y. 1998), *aff'd sub nom., U.S. Trust Co. of N.Y. v. Jenner,* 168 F.3d 630 (2d Cir.1999); *U.S. Trust Co. of N.Y. v. Executive Life Ins. Co.,* 602 F.Supp. 930, 936–41 (S.D.N.Y. 1984), *aff'd* 791 F.2d 10 (2d Cir.1986). There is, however, no case directly addressing this situation, which involves the assignment of claims between former and current shareholders as third-party beneficiaries to a contract between the issuer and a third party.

▪ As a general matter, causes of action are freely assignable pursuant to New York General Obligations Law § 13–101, but the assignment must be express.[5] There must be some acts or words indicating an intent to transfer an accrued claim. *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 151–52 (2d Cir.1995) (explaining that assignment of contract claims does not automatically assign tort claims and that some indication of intent to transfer is required); *Hanna v. Florence Iron Co. of Wisc.,* 222 N.Y. 290, 118 N.E. 629, 633 (1918) (finding no assignment where parties' agreement showed "no thought of including within its terms an assignment of any right of action for an existing breach of contract").

There is a statutory exception to the rule of express assignment that applies specifically to bonds. General Obligations Law § 13–107 provides that "[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands" against (a) the bond obligor, (b) the indenture trustee or depository, or (c) the guarantor of the obligation. N.Y. G.O.L. § 13–107(1). Based on this provision, the New York Court of Appeals has held that accrued breach of fiduciary duty claims against indenture trustees were automatically transferred to subsequent bondholders, regardless of whether the purchasers were injured by the alleged breach. *See Bluebird Partners L.P. v. First Fidelity Bank, N.A.,* 97 N.Y.2d 456, 741 N.Y.S.2d 181, 767 N.E.2d 672, 673–75 (2002).

NU argues that a provision of the New York Uniform Commercial Code similarly codifies a rule for the automatic assignment of stock-related contract claims against third parties. That provision, NU claims, is N.Y. U.C.C. § 8–302(a), which states that a purchaser of a "security acquires all rights in the security that the transferor had or had power to transfer." At the argument of the motions, NU made it clear that its claim to recovery on behalf of it shareholders, and its argument for the automatic assignment of the claims at stake, relies entirely on § 8–302(a). (*See* Mar. 26, 2004 Tr. ("Tr.") at 11.) The issue is thus whether the third-party beneficiary breach of contract claim against Con Ed under the Merger Agreement is a right *in* the security that is automatically transferred to subsequent purchasers with the sale of the stock. If the claims at issue are not controlled and automatically transferred by § 8–302(a), then they continue to

---

5. N.Y. G.O.L. 13–101 provides that "[a]ny claim or demand can be transferred" unless it (1) is a claim for damages for personal injury, (2) is founded on a grant that is or would be made void by a state statute, or (3) is expressly forbidden by a state or federal statute or contravenes public policy.

be held by the persons who owned NU shares on March 5, 2001 and who were potentially injured by Con Ed's alleged breach.

## A.

NU argues that the plain language of § 8–302(a) requires the automatic assignment of the right to sue Con Ed to purchasers of NU shares. In full, § 8–302 reads as follows:

(a) Except as otherwise provided in subsections (b) and (c), a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer.

(b) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.

(c) A purchaser of a certificated security who as a previous holder had notice of an adverse claim does not improve its position by taking from a protected purchaser.

N.Y. U.C.C. § 8–302.[6] Con Ed and Rimkoski respond that New York law generally requires the express assignment of existing causes of action and that § 8–302(a) does not alter this presumption. Con Ed and Rimkoski argue that the true meaning and function of § 8–302(a), as evidenced by

its language, statutory structure, legislative history, and relevant case law, have nothing to do with the assignment of contract claims against third parties. Rather, § 8–302(a) only relates to issues of ownership and title and generally claims against the issuer of a security. The provision does not define a claim against third parties as a "right in the security" or provide for its automatic transfer.

NU argues that § 8–302(a) does transfer accrued contract claims against third parties because it refers to *"all* rights" being automatically transferred without limitation. NU contends that because the right to obtain the merger consideration was based on possession of NU stock prior to the alleged breach, the right/remedy to sue for the merger consideration must be a right automatically transferred with the sale of the stock.[7] Section 8–302(a), however, refers to "all rights *in the security"* (emphasis added). NU's analysis merely begs the question of whether a third-party beneficiary claim, not against the issuer of the security but against a third party arising out of a separate contract, is a right *in* the security and not a right or remedy vesting in the person holding the security at the time of the breach.[8]

**6.** The general rule now expressed in § 8–302(a) was, prior to the 1997 amendments, stated in N.Y. U.C.C. § 8–301. The provision quoted above is as amended, effective July 1, 2001, but the 2001 amendment does not affect this case.

**7.** In equating the shareholders rights before and *after the breach, NU relies in part on* N.Y. U.C.C. § 1–201(36), which provides: " 'Rights' includes remedies."

**8.** NU cites *In re Saxon Sec. Litig.,* 644 F.Supp. 465, 474 n. 16 (S.D.N.Y.1985), which described N.Y. U.C.C. § 8–301, the predecessor to § 8–302(a), as conveying "all contract rights in the security." *Saxon* was a securities fraud case that dismissed the relevance of

U.C.C. § 8–301 in a footnote. That case thus was not addressing contract claims relating to the security, and the quoted phrase likely refers to the security as a contract creating rights between the issuer and the shareholder.

NU also quotes *Broderick v. Aaron,* 264 N.Y. 368, 374, 191 N.E. 19 (1934), which states that the " 'right to take benefits' [from stock] is derived from ownership and ceases with transfer of such ownership." But that statement does not resolve the question of whether the right to sue as a third-party beneficiary to a contract is a right of current NU shareholders "to take benefits" from the ownership of their stock, as opposed to being a right of former NU shareholders to remedy an injury caused to them by the alleged breach of the Merger Agreement.

NU also argues that because § 8–302(a) provides for the automatic transfer of all rights that "the transferor had or had power to transfer," and because Rimkoski "had power to transfer" the right to sue Con Ed, he must have done so automatically when he sold his shares. NU thus interprets § 8–302(a) as defining "all rights in the security" as any right that can be transferred and as codifying the automatic transfer of all claims accrued (except fraud claims, apparently) while holding a security.

The Official Commentary to § 8–302 undercuts NU's construction of the statute. Section 8–302(a) is a "statement of the familiar 'shelter' principle," as qualified by subsections (b) and (c), that ensures that a holder in due course gains clear title and may transfer his rights in the security as such. *See* N.Y. U.C.C. § 8–302(a), Official Comment ¶ 1; *cf.* N.Y. U.C.C. § 3–201 & Official Comment ¶ 3 (explaining "shelter rule"). As an expression of the shelter rule, § 8–302(a) does not define "rights in the security" as any right associated with the security that the transferor "had or had power to transfer." Instead, the phrase "had or had power to transfer" stands for the unremarkable proposition that people cannot transfer rights that they do not own or control. *See Haber v. Fireman's Fund Ins. Co.*, No. 98 Civ. 1740, 2000 WL 943562, at *7 (S.D.N.Y. July 10, 2000) (explaining that under shelter rule of § 8–301, which later became § 8–302, transferee "is only entitled to the 'rights' or ownership interest in the security that [the transferor] had in the Certificates"); *cf. Drexel Burnham Lambert Group, Inc. v. A.W. Galadari*, No. 84 Civ. 2602, 1987 WL 6164, at *24 (S.D.N.Y. Jan.29, 1987) (applying § 8–301 in finding that plaintiff "would be entitled only to those rights that [the transferor] 'had or had actual authority to convey' ").

NU's reading of § 8–302(a) transforms it to provide for the automatic transfer of all rights *related to* the security or *accrued while possessing* the security, instead of what the statute actually says, which is "all rights in the security." NU's reading also ignores subsections (b) and (c), which qualify subsection (a) and help to make it clear that § 8–302(a) is a statement of the shelter rule.

### B.

The legislative history of the predecessor provision to § 8–302(a) and the structure of U.C.C. Article 8 confirm that § 8–302(a), rather than defining what rights are in the security, involves the mechanism for transferring rights and applies primarily to disputes over the quality of title and the competing ownership rights passed from transferor to transferee. N.Y. U.C.C. § 8–301, originally enacted in 1962, is the predecessor to the current § 8–302, and it provided:

(1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. "Adverse claim" includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.[9]

(3) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.

N.Y. U.C.C. § 8–301(3) became the modern § 8–302(b). The lengthy qualification in § 8–301(1) beginning with "except" has been sim-

---

9. The 1964 version of N.Y. U.C.C. § 8–301 also provided:

(2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim.

N.Y. U.C.C. § 8–301(1) (McKinney 1964) (attached as Ex. B. to Con Ed's App. of Unreported Materials ("Con Ed App.")). Section 8–301 thus expressed the shelter rule with its exception and impact on competing claims to the security. *See id.* & Official Comment ¶ 3 (describing § 8–301(1) as "shelter provision").

As the Official Comment to § 8–301 explained, Article 8 "views the concept of negotiability from two aspects: issuer's defenses and adverse claims." N.Y. U.C.C. § 8–301, Official Comment ¶ 1. Section 8–301/8–302 [10] thus anticipates two situations. One involves "adverse claims" where a prior security holder asserts a claim to the security against the current holder. The other situation—"issuer's defenses"—envisions actions to enforce rights against the issuer where the issuer may defend by arguing that the right or status necessary for the action was not transferred to the plaintiff, perhaps because the transferor did not "ha[ve] or ha[ve] the actual authority to convey" the right. *See* N.Y. U.C.C. § 8–301 & Official Comment ¶ 1. This case, however, deals neither with competing claims to the security, nor with an action based on the security against the issuer where defects in the security transferred may raise a defense. There are no questions about the quality of the transfer or title conveyed in the NU shares; the only question is whether the security itself embodies the *contracts* rights against Con Ed arising out of the Merger Agreement.

The statutory scheme of Part 3 of Article 8 involves rules for the negotiability and transfer of securities,[11] and § 8–301/8–302 is part of that statutory scheme, which "deals with the rights and liabilities of successive holders of a security as between themselves." N.Y. U.C.C. § 8–301, Practice Commentary (explaining "the frame of reference" of Article 8, Part 3 as dealing with " 'transfer' as distinct from 'the registration of transfer,' which is dealt with in Part 4"). Article 8 as a whole "does not set forth general rules defining property rights that accrue to holders of securities" and instead simply "sets forth rules relative to the transfer of the rights." N.Y. U.C.C. § 8–101, Official Comment (1977) (attached at Con Ed Supp.App. Ex. J). As the Court of Appeals for the Third Circuit has explained:

> Article 8 was designed to facilitate the negotiability and trading of securities by assigning responsibility for certain steps involved in a stock transfer to the principal parties in the chain, thus relieving each party to the transfer of the need to check all aspects of the transaction-from the validity of the issuance to the validity of the stock-owner's identity and signature-at each step of the stock transfer.

*N.J. Bank, N.A. v. Bradford Sec. Operations, Inc.,* 690 F.2d 339, 346 (3d Cir.1982).

Section 8–302 does not define "rights in a security" or codify a rule assigning to purchasers any claim accrued while possessing the security. The provision simply provides that whatever "rights in the security" are, they are automatically transferred to a purchaser unless (a) the trans-

---

plified in the current § 8–302(c), which states that a purchaser "who as a previous holder had notice of an adverse claim does not improve his position."

**10.** All references and citations to U.C.C. §§ 8–301 and 8–302 are to the rule at issue now codified in § 8–302 unless noted.

**11.** In the current N.Y. U.C.C. Article 8, Part 3: § 8–301 involves the "delivery" of a security;

§ 8–302 concerns the "Rights of Purchaser"; § 8–303 defines a "Protected Purchaser"; § 8–304 involves endorsements; § 8–305 concerns instructions; § 8–306 involves the "Effect of Guaranteeing Signature, Endorsement, or Instruction"; and § 8–307 covers "Purchaser's Right to Requisites for Registration of Transfer."

feror did not own or control them, (b) the purchase was for a limited interest, or (c) the purchaser is a prior holder with notice of an adverse claim taking from a protected purchaser. N.Y. U.C.C. § 8–302(a)–(c). NU cannot rely on the plain language of § 8–302(a) because the language itself does not control what "rights in the security" are. Nothing in the provision's language, its history, or the statutory structure indicates that the statute governs the claim arising under the Merger Agreement, as opposed to an action arising from a contract transferring the security or a defense by an issuer in an action under the security.

## C.

The few cases construing § 8–301/8–302(a) confirm that the statute does not address rights of third-party beneficiaries arising out of agreements separate from the contract embodied in the security. The primary case cited by Con Ed and Rimkoski, and the case most closely on point in this case, is *Licht v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 24560/82, slip op. (N.Y.Sup.Ct. Sept. 1, 1983) (attached as Con Ed App. Ex. A), *aff'd mem.*, 100 A.D.2d 987, 474 N.Y.S.2d 1004 (1984). In *Licht*, the plaintiffs were holders of worthless bonds purchased at a discount after it was known that they were worthless. They sued the bond underwriters, the director of the bond issuer, and the auditor of the issuer. The complaint "set forth several theories of recovery including violation of New York Securities Laws, quasi contract, breach of fiduciary duty, recklessness, common law fraud, and negligence." *Id.* at 3. The plaintiffs argued that N.Y. U.C.C. § 8–301 (as well as

N.Y. G.O.L. § 13–107) gave them standing to sue.

The court rejected the theory that the bonds' sale automatically transferred to the purchasers "all common law and statutory claims of the prior owners." *Licht*, slip op. at 2–3. With respect to § 8–301, the court held:

As the Practice Commentary makes clear, this section applies only to claims arising between the transferor and the transferee of a security. This section does not apply to claims which arise between a subsequent transferee on the one hand and the underwriter, auditor, and director of the corporation which issues the security, on the other.

*Id.* at 4; *cf.* § 8–301, Practice Commentary. NU contends that the Court should not apply the principle in *Licht* for two reasons. First, NU argues that *Licht* is inapposite because it involved fraud claims, which are distinguishable and clearly do not run with the security. Second, NU asserts that the opinion erred in interpreting § 8–301 and its legislative history.

With respect to NU's first argument, *Licht*'s discussion of § 8–301 did not distinguish fraud claims as unique; it simply found that § 8–301 applied to claims between transferors and transferees and did not apply "to claims" against the third parties. *Licht*, slip op. at 4. That principle is relevant and decisive in this case.[12] Even if *Licht* is not "binding" on this Court, its interpretation of § 8–301 is instructive and persuasive given that, of the cases offered by the parties, *Licht* comes closest to addressing the specific provision and issue in this case. *Cf. Nucorp*, 772 F.2d at 1493 (addressing New York law

12. Moreover, the plaintiffs were also suing for breach of "quasi contract" and certain duties of care, and thus, similar to third-party beneficiaries, were asserting rights against third parties arising out of contracts between the security issuer and those parties. The decision, however, referred to the issue as depending on the automatic transfer of the fraud claims. *See Licht*, slip op. at 3–5.

claims for breach of fiduciary duty, fraud, and negligence, and relying on holding in *Licht* that "state law claims [are] not automatically transferred when the underlying security [is] sold"); *Lowry*, 629 F.Supp. at 533–34 (applying New York law in securities case and finding *Licht* authoritative on U.C.C. § 8–301 and assignment of state law claims).

NU also argues that *Licht* is clearly erroneous because it allegedly selectively relied on the language in the beginning of the § 8–301 Practice Commentary that describes the provision as covering claims "of successive holders of a security as between themselves." N.Y. U.C.C. § 8–301, Practice Commentary. NU contends that the Court must look further in the Commentary, where it states that "each transferee acquires whatever rights his transferor had or had authority to convey." *Id.* NU's response to *Licht* is thus the same as its plain language argument that § 8–302(a) defines rights in the security as any assignable right related to the security. As explained above, the phrase "had or had actual authority to convey" simply means that transferors cannot give away more rights than they possess or control; it does not codify a rule transferring any cause of action accrued while holding the security. Moreover, the rest of the sentence quoted by NU, along with the paragraph that follows, confirms that the provision is primarily concerned with bona fide purchasers and adverse claims—that is, the potentially competing rights between transferors and transferees.[13]

Judge Stanton's decision in *Haber*, 2000 WL 943562, further supports understand-

ing § 8–301/8–302(a) as applying to claims to the security, particularly concerning the transfer of bona fide purchaser status, and defenses against enforcement of the ownership rights in the security. *See* N.Y. U.C.C. § 8–301, Official Comment. In *Haber*, after certain bonds were declared missing and without value for anyone except for a bona fide purchaser, a bondholder emerged and attempted to assert rights against the obligor. In determining whether the plaintiff acquired rights through the operation of § 8–301, the court explained that the phrase "rights in the security" "concern[s] the transferor's title, or ownership interest, in the security itself in relation to the ownership interest of others." *Id.* at *6. The court concluded that the plaintiff was unable to recover under the bonds because he received the bonds as a gift from a person who was not a bona fide purchaser and who thus could not transfer that status to the plaintiff. *Id.* at *6–*7; *cf. Johnson v. Shearson Loeb Rhoades, Inc.*, No. 83 Civ. 3937, 1984 WL 1028, *1, *7 (S.D.N.Y. Oct.18, 1984) (involving counterclaim asserting rights to securities wrongfully held by plaintiff/counterclaim defendant, where prior holder was not bona fide purchaser and thus under § 8–301 could not transfer that status to plaintiff).

*Licht* and *Haber* thus support the interpretation of § 8–302(a) advanced by Rimkoski and Con Ed. Meanwhile, NU can point to no case supporting its construction of the provision as transferring third-party beneficiary claims arising out of contracts independent from the security itself.

---

**13.** The full sentence on which NU relies reads: "As stated in this section, each transferee acquires whatever rights his transferor had or had authority to convey, and if he is a bona fide purchaser (U.C.C. § 8–302) acquires the instrument free of any 'adverse claims'." N.Y. U.C.C. § 8–301, Practice Commentary. The import of the sentence is in the second clause, not in the familiar statement of the shelter rule quoted by NU. The paragraph that follows discusses the use and definition of the term "adverse claims," which, it explains, was intended to be a "broadly defined concept" and to substitute for terminology such as "defect in title" or "claim of ownership." *See id.*

### D.

While *Licht* and *Haber* described § 8–301/8–302(a) as addressing issues of ownership and title, Con Ed and Rimkoski acknowledge that the term "rights in the security" does not involve only rights to title as between transferors and transferees. It also generally includes rights vis-à-vis the issuer arising out of the security itself. There is no support, however, for NU's proposition that "rights in the security" include rights from a separate contract as to which shareholders are third-party beneficiaries.

A security itself is essentially a contract between the issuer and the holder that, in the case of certificated stock for example, provides rights through the terms of the certificate and incorporated documents. *See* N.Y. U.C.C. § 8–202. A holder's rights in the security thus include the rights against the issuer under the contract embodied in the security as supplemented by federal and state law. With stock, these rights in the security against the issuer generally include participatory rights in the corporation, such as the right to attend meetings, vote, and inspect corporate records, as well as rights to corporate assets, such as the right to receive dividends. *See, e.g.,* N.Y. U.C.C. § 8–207(a) ("[T]he issuer or indenture trustee may treat the registered owner as the person exclusively entitled to vote, receive notifications, and otherwise exercise all the rights and powers of an owner.").[14] The Official Comment to U.C.C. § 8–114, which governs evidentiary rules for "actions on certificated securities," explains that " 'an

action on a security' includes any action or proceeding brought against the issuer to enforce a right or interest that is part of the security." N.Y. U.C.C. § 8–114, Official Comment (explaining such actions as including those "to collect principal or interest or a dividend, or to establish a right to vote or to receive a new security under an exchange offer or plan of reorganization").[15]

Understanding "rights in the security" as against the issuer is consistent with the statement in the Official Comment to § 8–301 that Article 8 concerns negotiability in relation to two aspects. *See* N.Y. U.C.C. § 8–301, Official Comment ¶ 1. While one aspect is adverse claims—that is, claims between transferors and transferees, *see Licht,* slip op. at 4; *cf. Johnson,* 1984 WL 1028—the second aspect is "issuer's defenses." That aspect involves "actions on a security" against the issuer to enforce "rights in the security" but where there is a defense that, for example, the transferor did not own the rights or title needed for the claim. *See Haber,* 2000 WL 943562.

In sum, upon the transfer of stock, the transferee receives rights in the security vis-à-vis the issuer and rights vis-à-vis other potential holders, including, for example, good title and bona fide purchaser status. Nothing in the text of § 8–302(a), in its history or commentary, or in other provisions of the U.C.C. supports NU's proposition that "rights in the security" include contract rights against third parties or that § 8–302(a) codifies a rule for

---

**14.** *See also Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (identifying "characteristics usually associated with common stock as (i) the right to receive dividends . . .; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights . . .; and (v) the capacity to appreciate in value").

**15.** NU argues that the reference to a plan of reorganization would include the failed merger in this case. But the text of § 8–114 plainly refers to "an action on a certificated security against the issuer." Moreover, any rights held by NU shareholders against Con Ed are and would be enforceable as an action on the Merger Agreement, not an action on the security.

the automatic transfer of such rights to subsequent purchasers of the stock.

## IV.

■ At various points in its papers, NU draws on New York's General Obligation Law § 13–107, which applies only to bonds, as supporting its position in this case by analogy. Section 13–107 was enacted in 1950 "to effect a major change in New York" by providing that certain bondholder claims transfer automatically with the sale of the bond, even if the cause of action arose prior to sale and was known to the subsequent purchaser. *See Bluebird Partners,* 741 N.Y.S.2d 181, 767 N.E.2d at 675 (explaining history and impact of rule in case where bondholder claim against indenture trustees for breach of fiduciary duty automatically transferred regardless of lack of injury to buyer). NU argues, based on language in the legislative history of G.O.L. § 13–107, that providing for the automatic transfer of certain third-party bond claims was intended to make the rule for bonds conform to the rule for stocks. It thus asserts that the rule for stocks is for the automatic transfer of similar third-party claims. The language, history, and effect of G.O.L. § 13–107 undermine NU's argument.

Section 13–107(1) of the General Obligations Law provides:

Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee, or depositary.

Section 13–107 thus provides for the automatic transfer of claims against three parties: the obligor, the indenture trustee or depository, and the guarantor. *See Report of the Law Revision Commission,* No. 65, at 3 (1950) ("LRC Report") (attached at Con Ed.App. Ex. F.). The Law Revision Commission ("LRC" or the "Commission") explained that under the then-existing law of New York, "a transfer of bonds does not carry with it existing claims for damages against a trustee under an indenture securing the bonds." *Id.* at 5. The Commission noted that such a rule would often thwart parties' expectations because "[b]onds, like stock, are commonly thought of as embodying not only the promises on the face of the instrument, but also the underlying security and any rights against the obligor, indenture trustee or guarantor." *Id.*

NU asserts that G.O.L. § 13–107 was intended to codify for bonds an alleged long-standing common law rule that all accrued causes of action related to the possession of stock are automatically transferred. The legislative history actually provides little support for the existence of such a rule.[16] But the most serious problem for NU's reliance on G.O.L. § 13–107 is that the provision is expressly limited to claims against the obligor, the indenture trustee or depository, and the

---

**16.** In fact, the LRC Report suggests that to the extent there was a common law consensus on the issue, it favored the reservation of accrued claims in the seller of the security:

In the absence of any overriding public policy, the parties to a transfer of property or a contract may include or exclude accrued causes of action.... If no reference is made to such a cause of action, the courts are likely to rule that it is not transferred but is reserved to the transferor. When a known cause of action is not mentioned, the inference that it is reserved is almost unescapable.

LRC Report at 26.

guarantor. G.O.L. § 13–107 does not extend to other third-party claims and thus could not reflect any sweeping common law rule for the automatic transfer of all accrued claims relating to the possession of stock. *See Licht*, slip op. at 4–5 (rejecting bondholder claims against underwriter, corporate director, and auditor where plaintiffs alleged standing under § 13–107).

The relationship between the NU shareholders and Con Ed does not fit into any of the categories enumerated in G.O.L. § 13–107, and even if § 13–107 directly applied in this case, the Judgment Class would not own the right to sue Con Ed for its alleged breach of the Merger Agreement. (*See* Tr. at 10.) Thus, G.O.L. § 13–107 cannot, by analogy or otherwise, support NU's argument for the automatic assignment of the third-party beneficiary claims against Con Ed.

## V.

Beyond focusing on the statutory provisions of N.Y. U.C.C. § 8–302(a) and G.O.L. § 13–107, NU argues that the practicalities of the market and of litigation show that the claims should run with the stock and go to the Judgment Class. NU asserts that the market can and does incorporate the value of a potential right to recover into the post-breach stock price and that the automatic transfer of all rights incidental to the stock facilitates clarity in transactions and the fungible nature of the security. A similar argument for the automatic transfer of claims under the Trust Indenture Act was made to the Court of Appeals for the Second Circuit in *Bluebird* and was found unconvincing. *See Bluebird*, 85 F.3d at 974–75. Moreover, NU admitted at the argument of the motions that treating breach of contract claims like securities fraud claims— that is, as vesting in the persons injured— would be a clear rule for the market. (Tr. at 24.)

NU also argues that there is a potential for confusion in litigating a failed merger if a corporation seeks specific performance while former shareholders pursue damages. In such a situation, NU argues, a purchaser corporation would be subject to double liability by not only having to purchase outstanding shares at a premium, but also by being required to pay damage claims to former shareholders. These theoretical concerns are not persuasive for several reasons.

First, as Con Ed points out, the right determines the remedy and not the other way around. Once that right is determined, then the issue of remedies can be addressed. The rights in this case are determined by the interpretation of U.C.C. § 8–302(a). The text, history, statutory structure, and case law connected to § 8–302(a) show that the statute does not define the claims in this case as "rights in the security" that are automatically transferred by the sale of the stock.

Second, if competing claims for specific performance and damages arose, the court hearing the case would be in a position to handle any complexities. For example, the court could find that specific performance would not be available because the legal remedy of damages would be available to address the breach. *See, e.g., La Mirada Prods. Co. v. Wassall PLC*, 823 F.Supp. 138, 141 (S.D.N.Y.1993) ("[S]pecific performance usually is limited to contracts for whose breach the traditional remedy of damages is inappropriate. . . ."). Alternatively, a court could use its equitable power to craft an order of specific performance that allows for damage claims while avoiding inequity to the purchaser corporation. Whether specific performance will be appropriate and available in any given case will be highly dependent on the facts of the case. Moreover, sophisticated parties can craft their agreements to

avoid complications and fulfill their intent.[17]

Finally, the automatic transfer of the claims to continuing shareholders will not necessarily solve any confusion and may even generate its own complications. Securities fraud claims are not automatically assigned, and in a case of a failed merger that involved both securities fraud claims and breach of contract claims, the rule proposed by NU would create a situation where former and current shareholder classes would each have different claims that could be pursued for similar damages.

In any event, there is no confusion in this case because NU is not seeking specific performance and has in fact eschewed specific performance in order to assert damages purportedly on behalf of its current and future shareholders. Any prospect of complications in other cases, so long as the rule is clear, can be handled by parties before entering into agreements. Moreover, such hypothetical problems cannot change the interpretation of § 8–302(a) and determine the rights involved.

## V.

█ The Court thus finds that the right to pursue damages from Con Ed based on the merger premium lies with Rimkoski and the proposed March 5 Class and not with NU on behalf of the Judgment Class. Con Ed's motion to dismiss NU's counterclaim for those damages is therefore granted because NU does not seek to recover damages on behalf of the proposed March 5 Class. NU's motion for summary judgment on its crossclaim against Rimkoski is denied.

█ The Court, however, is of the opinion that the legal issue raised by these motions should be certified pursuant to 28 U.S.C. § 1292(b) to allow NU to seek an interlocutory appeal before the Court of Appeals for the Second Circuit. The question of law at the heart of these motions is: Where shareholders are third-party beneficiaries of a contract between the issuer of the stock and a third party, is the right to sue that third party for breach of the contract automatically transferred to a subsequent purchaser of the stock?

Pursuant to § 1292(b), the Court may certify an issue for interlocutory appeal if it is "of the opinion" that (1) the order "involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion" and (3) "that an immediate appeal of the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The determination of whether § 1292(b) certification is appropriate under these standards initially lies within the discretion of the district court. *See, e.g., Ferraro v. Sec'y of U.S. Dep't of Health & Human Servs.,* 780 F.Supp. 978, 979 (E.D.N.Y. 1992) (collecting cases). Interlocutory appeals are an exception to the general policy against piecemeal appellate review embodied in the final judgment rule, and only "exceptional circumstances [will] justify a

---

**17.** NU previously represented that expressly making its shareholders third-party beneficiaries was intended to enable the corporation to sue on behalf of its shareholders in the event of a breach. *See Consol. Edison,* 249 F.Supp.2d at 417 n. 11. Corporations could simply not make their shareholders third-party beneficiaries.

Parties to a merger could also specify that any breach will result in damages to be distributed to shareholders of record at a designated time after judgment. *Cf. Alpert,* 10 F.Supp.2d at 297–304 (finding that under indenture agreement, current holders of units in trust rather than former holders had right to certain litigation proceeds distributed by trust); *Executive Life Ins. Co.,* 602 F.Supp. at 936–41 (involving trust indenture with clearly established mechanism for distributing interest payments to current bondholders in case of default).

departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *see also Flor v. BOT Fin. Corp.,* 79 F.3d 281, 284 (2d Cir.1996) (per curiam) (collecting cases). The institutional efficiency of the federal court system is a chief concern underlying § 1292(b), *see Suozzo v. Bergreen,* No. 00 Civ. 9649, 2003 WL 256784, at *3 (S.D.N.Y. Feb.5, 2003), and the Court of Appeals has repeatedly emphasized that a district court is to "exercise great care in making a § 1292(b) certification." *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.,* 964 F.2d 85, 89 (2d Cir.1992). Section 1292(b) was not intended "to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation," and certification is warranted only in "exceptional cases" where early appellate review "might avoid protracted and expensive litigation." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 690 F.Supp. 170, 172 (S.D.N.Y.1987) (internal quotations omitted); *see also German v. Fed. Home Loan Mortgage Corp.,* 896 F.Supp. 1385, 1398 (S.D.N.Y.1995).

These motions raise a controlling question of New York state law that is an issue of first impression with little case law that is even closely analogous. There is substantial ground for difference of opinion, and the implications of the decision in this case are far reaching, potentially affecting billion-dollar transactions in this case and others. Most importantly, this is an "exceptional case" where early appellate review will materially advance the termination of the litigation and "avoid protracted and expensive litigation." *Telectronics,* 690 F.Supp. at 172. The so-called lost merger premium at stake is potentially worth over $1 billion and is part of a complex litigation. Providing certainty as to which class owns the claims against Con Ed will help streamline the litigation for trial and on appeal. Without certainty, it will be impossible to reach any resolution short of trial, and if the Court's decision on the law were reversed on appeal after trial, it could requiring retrying the issue.

The Court has also decided to certify an order for interlocutory appeal of the issue determined on Con Ed's earlier motion for partial summary judgment: whether, under the Merger Agreement, NU shareholders are intended third-party beneficiaries who have the right to pursue a claim against Con Ed for breach of the Agreement. *See Consol. Edison,* 249 F.Supp.2d at 416–17. That issue was also a controlling question of law and similarly had little case law on point while presenting substantial ground for a difference of opinion.

Determination of that issue will also materially advance the ultimate termination of the litigation. As explained above, this is a complex litigation where the alleged "lost premium" is worth over $1 billion and is by far the most valuable claim in the litigation. In contrast, NU's claim for damages to the corporation itself is $27 million and Con Ed's primary interest in the litigation is a declaration that it has no obligations under the Merger Agreement. If it is determined at this stage that the claim for the billion-dollar merger premium cannot be brought, that will substantially change the face of the litigation.

Because the Court is certifying the issue of which shareholder class has the right to the claim, it is particularly efficient to certify the related issue of whether any shareholder class has a claim. That issue is necessarily involved in the current order because Rimkoski cannot pursue his claim unless he is a third-party beneficiary of the Merger Agreement. A decision that NU shareholders are not intended third-party beneficiaries renders the other question moot. The parties agree that the issue in

these motions, however decided, would be suitable for interlocutory appeal and that it would be efficient to certify Con Ed's ability to seek an interlocutory determination of the previously decided issue as well. (*See* Tr. at 33, 45–46.)

### Conclusion

For the reasons explained above, Con Ed's motion to dismiss NU's "lost premium" counterclaim on behalf of current and future NU shareholders is **granted**. NU's motion for summary judgment on its crossclaim against Rimkoski is **denied**. In addition, the Court pursuant to 28 U.S.C. § 1292(b) certifies this order for interlocutory appeal to the Court of Appeals for the Second Circuit on two issues: (1) whether NU shareholders are intended third-party beneficiaries under the Merger Agreement; and (2) if so, whether the claim for damages for breach of contract against Con Ed was automatically transferred from the shareholders who owned NU shares on March 5, 2001 to subsequent purchasers of the NU shares.

**SO ORDERED.**