**CONSOLIDATED EDISON, INC.,**
Plaintiff/Counterclaim
Defendant,

v.

**NORTHEAST UTILITIES,**
Defendant/Counterclaim
Plaintiff/Crossclaim Plaintiff,

and

**Robert Rimkoski, individually and on behalf of all others similarly situated,** Intervenor Defendant/Counterclaim Plaintiff/Crossclaim Defendant.

**No. 01 Civ. 1893(JGK).**

United States District Court,
S.D. New York.

Aug. 24, 2004.

Richard B. Brualdi, Law Offices of Richard B. Brualdi, New York City, for Martin Siegel.

John Gueli, Kenneth M. Kramer, Stuart J. Baskin, Shearman & Sterling, LLP, New York City, for Consolidated Edison, Inc.

Douglas M. Kraus, Joseph N. Sacca, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, Northeast Utilities.

Ira A. Schochet, Lawrence A. Sucharow, Lisa Buckser–Schulz, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, for Robert Rimkoski.

### OPINION and ORDER

KOELTL, District Judge.

This case arises out of the failed multi-billion dollar merger between Consolidated Edison, Inc. ("Con Ed") and Northeast Utilities ("NU") that has been the subject of three prior opinions by this Court. *See Consol. Edison, Inc. v. Northeast Utils.,* 318 F.Supp.2d 181 (S.D.N.Y.2004); *Consol. Edison, Inc. v. Northeast Utils.,* No. 01 Civ. 1893, 2004 WL 35445 (S.D.N.Y. Jan.7, 2004); *Consol. Edison, Inc. v. Northeast Utils.,* 249 F.Supp.2d 387 (S.D.N.Y.2003).

Con Ed brought this action for a declaratory judgment that it has no obligations under the Merger Agreement with NU, which fell apart amidst mutual recriminations shortly before it was to be com-

pleted. NU has argued that Con Ed repudiated and breached the Agreement and has asserted counterclaims on behalf of itself as a corporation. In addition, NU asserted a $1.1 billion claim on behalf of NU shareholders as third-party beneficiaries of the Merger Agreement whose NU stock would have been purchased by Con Ed at a substantial premium had the merger been completed. In a recent Opinion and Order, this Court dismissed NU's "lost premium" claim on behalf of its current shareholders, ruling that only shareholders who held NU stock at the time of Con Ed's alleged breach on March 5, 2001 could seek damages as third-party beneficiaries of the Merger Agreement. *See generally Consol. Edison,* 318 F.Supp.2d 181.[1] The third-party beneficiary claim is now being pursued by Robert Rimkoski, who has intervened as a defendant to sue Con Ed for breach of contract on behalf of himself and a putative class of similarly situated March 5, 2001 shareholders (the "March 5 Class").[2]

Con Ed has asserted as its twelfth affirmative defense that a settlement in the action *Brody v. Cleveland,* No. 00 Civ. 2400 (S.D.N.Y. filed Mar. 29, 2000) (Chin, J.), released Con Ed from liability under the Merger Agreement for the third-party beneficiary shareholder claims. NU now moves for summary judgment dismissing Con Ed's twelfth affirmative defense of "release." Con Ed opposes the motion and has cross-moved for partial summary judgment on its defense against the shareholder breach of contract claim now being asserted by Rimkoski, who has submitted papers supporting NU's motion for summary judgment.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve

---

**1.** The Court also certified for interlocutory appeal to the Court of Appeals for the Second Circuit the question of which shareholder class had the right to sue Con Ed, along with the related question of whether the Merger Agreement created third-party beneficiary rights for the shareholders at all. *See Consol. Edison,* 318 F.Supp.2d at 195–96.

**2.** Rimkoski has filed a motion to certify a class of March 5, 2001 shareholders, but the class has not yet been certified.

all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan. v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998).

## II.

The following facts are undisputed unless otherwise noted.[3] On October 13, 1999, Con Ed and NU executed the Agreement and Plan of Merger (the "Merger Agreement") providing for the acquisition of NU by Con Ed, subject to certain conditions including the approval of NU's and Con Ed's shareholders. (NU's Rule 56.1 Stmt. ¶ 1; Con Ed's Rule 56.1(b) Stmt. ¶ 1.) That same day, Adele Brody, an NU shareholder, filed a class action lawsuit in New York state court against NU and NU's Board of Trustees alleging that they had breached their fiduciary duty by agreeing to the merger with Con Ed for inadequate consideration. (NU's Rule 56.1 Stmt. ¶ 2.) On October 19, 1999, another NU shareholder, Bryna Thistlewhaite, brought a similar class action, also in New York state court, alleging that the merger consideration was inadequate and that NU's trustees breached their fiduciary duty by agreeing to pay a termination fee of $130 million-approximately $1 per NU share-in the event that NU elected not to proceed with the transaction. *(Id.* ¶ 3.)

On February 29, 2000, Con Ed and NU disseminated a joint proxy statement/prospectus (the "Joint Proxy") soliciting the support of their respective shareholders for the merger at special shareholder meetings scheduled for April 14, 2000. *(Id.* ¶ 4.) On March 29, 2000, Adele Brody and Bryna Thistlewhaite filed the action *Brody v. Cleveland,* No. 00 Civ. 2400 (the "*Brody* Action") in this district. *(See id.* ¶ 5.) This new lawsuit, which was assigned to Judge Chin, named as defendants NU, NU's Trustees, and Con Ed, and it asserted two causes of action. *(Id.* ¶ 6.) Count I alleged that the Joint Proxy was materially false and misleading, in violation of Section 14(a) of the Securities Exchange Act of 1934, because it failed to disclose information concerning Con Ed's potential liabilities and other costs arising from the operation of its Indian Point nuclear power plant. *(See id.)* Count II asserted a pendent state law claim for breach of fiduciary duty against NU's trustees based on the "termination fee" claim initially asserted in Thistlewhaite's state court action. *(Id.)*

On March 31, 2000, the plaintiffs in the *Brody* Action made an application for expedited discovery and a preliminary in-

---

**3.** *See* NU's Local Rule 56.1 Statement of Material Facts Not in Dispute ("NU's Rule 56.1 Stmt."); Con Ed's Local Rule 56.1(a) Statement of Uncontested Material Facts ("Con Ed's Rule 56.1(a) Stmt."); Con Ed's Local Rule 56.1(b) Statement in Opp. to NU's Mot. for Summ. J. ("Con Ed's Rule 56.1(b) Stmt.").

junction enjoining the April 14, 2000 special shareholder meetings to vote on the merger. (*Id.* ¶ 7.) Shortly thereafter, the parties entered into a stipulation, whereby Con Ed and NU agreed to disseminate a Supplemental Proxy addressing the issues raised by the plaintiffs; the plaintiffs agreed to withdraw their pending motion to enjoin the special shareholder meetings, and they agreed to dismiss Count I of their complaint with prejudice, except as to any application for attorneys' fees or costs. (*See id.* ¶ 8; Con Ed's Rule 56.1(b) Stmt. ¶ 8; Decl. of John Gueli ("Gueli Decl."), dated Mar. 22, 2004, Ex. 2 (Stipulation and Order, dated Apr. 5, 2000).) The Stipulation and Order was signed by Judge Chin on April 11, 2000, and the special shareholder meetings proceeded as scheduled, with the shareholders of both companies ultimately approving the merger. (*See* NU's Rule 56.1 Stmt. ¶¶ 9, 11.)

From that point forward, the parties engaged in settlement negotiations and the drafting of a Stipulation of Settlement to dismiss the entire action. (*See id.* ¶ 12; *see also* Gueli Decl. Exs. 3–5 (drafts of settlement agreement dated June 2000 and July 2000).) By fall 2000, however, it became clear that the Count II claims could not be settled, and the parties ultimately entered into a formal Stipulation of Settlement dated March 9, 2001, under which Con Ed would pay $600,000 to plaintiffs' counsel for their attorneys fees and Count I of the complaint would be dismissed with prejudice, but Count II would remain. (*See* NU's Rule 56.1 Stmt. ¶¶ 13–14; Con Ed's Rule 56.1(a) Stmt. ¶ 20; Decl. of Joseph N. Sacca, dated Jan. 26, 2004, Ex. 3 (Stipulation of Settlement or "Settlement Agreement").) The Settlement Agreement, however, included a release that applied to more than just the claims asserted in Count I:

"Released Claims" means and includes the allegations, claims and causes of action that have been asserted against the Released Persons in the Federal Litigation, as well as all claims that might have been or might be asserted that arise or potentially arise out of or relate in any way to the Merger Agreement, the merger of Con Edison and Northeast, the Initial Proxy and/or any of the transactions described in the Initial Proxy, other than those claims asserted in Count II of the Federal Complaint.

(Settlement Agreement § IV, ¶ 1.12.)

Around the time that the *Brody* settlement was being finalized, concerns began to arise that the merger would not be completed. (*See* NU's Rule 56.1 Stmt. ¶ 18; Con Ed's Rule 56.1(b) Stmt. ¶ 18.) On March 5, 2001, in response to a demand by NU for reasonable assurances, Con Ed advised NU that it was unwilling to proceed on the terms set forth in the Merger Agreement. (*See* NU's Rule 56.1 Stmt. ¶¶ 19–20.) That same day, NU announced that Con Ed had rejected its request for reasonable assurances, that it was treating the rejection as an anticipatory repudiation of the Merger Agreement, and that it intended to take appropriate action to recover the benefits of the Merger Agreement for its shareholders. (*Id.* ¶ 21.) Thus, as of March 5, 2001, the merger was terminated, and the causes of action for Con Ed's alleged breach of contract are alleged to have accrued on that date. (*See* Con Ed's Rule 56.1(b) Stmt. ¶ 21.) The next day, March 6, 2001, Con Ed commenced this action for declaratory judgment. (NU's Rule 56.1 Stmt. ¶ 22.) On March 12, 2001, NU filed a separate action asserting damages for breach of contract on behalf of its shareholders; NU subsequently withdrew that action and asserted its claim as a counterclaim in the current action. (*See id.* ¶¶ 23–24.)

Thus the Merger Agreement was terminated and this action arose just days before the parties in the *Brody* Action formally entered into the Settlement Agreement. On March 16, 2001, counsel for the parties in the *Brody* Action-who were different from the lawyers representing Con Ed and NU in the current action-appeared before Judge Chin and advised him of the settlement, as well as of the collapse of the merger and the recently filed litigation. (*See id.* ¶ 25.) As a result, Judge Chin dismissed as moot Count II of the *Brody* complaint, which was based on NU's promise to pay a termination fee if it refused to proceed with the merger. (*Id.* ¶ 26.) On April 9, 2001, Judge Chin signed an order that: scheduled a hearing on the fairness of the proposed settlement for July 13, 2001; approved the form of notice to members of the *Brody* Class, defined as NU shareholders who were eligible to vote at the special shareholder meeting on April 14, 2000; and directed that the notice be sent to class members. (*Id.* ¶ 27; *see also* Sacca Decl. Ex. 4 at CRV 0000977 (Notice of Proposed Class Action Settlement and of Settlement Hearing ("Notice"), attached to Notice of Compliance with Preliminary Order Certifying Class Action for Settlement Purposes, dated July 11, 2001).) Beginning on May 11, 2001, the Notice to class members was mailed. (*See* NU's Rule 56.1 Stmt. ¶ 28.)

Judge Chin held a fairness hearing on the *Brody* settlement on July 13, 2001 (*id.* ¶ 35.), in which he stated:

I have reviewed the papers and just so I'm clear, or to make sure I understand it, the settlement simply consists of the fact that after the plaintiffs filed the action and brought on an application for an order to show cause, ... the defendants agreed to send out a supplemental proxy. In fact, a supplemental proxy was sent out and thereafter the merger did not go through. Count two was rendered moot.

The stipulation does not contemplate any further relief with respect to Count One, the supplemental proxy having served its purpose there is no pool of money and settlement simply at this point is dismissal, the only question being attorney's fees, correct?

(Tr. of July 13, 2001 Hearing ("July 2001 Tr.") at 2, attached at Sacca Decl. Ex. 5.) The parties agreed and no objections to the Settlement Agreement were raised. (*See* NU's Rule 56.1 Stmt. ¶¶ 38–39.) After discussing the issue of attorneys' fees, Judge Chin approved the settlement, finding "that the settlement is reasonable, it was negotiated by competent counsel on both sides, and under all the circumstances it's fair that the absence of any objections is significant." (July 2001 Tr. at 6.) Judge Chin then entered an Order of Final Approval of Settlement and Final Judgment, and Order of Dismissal dismissing the "Released Claims" and approving $600,000 in attorneys' fees and expenses to be paid by Con Ed. (*See* Sacca Decl. Ex. 12 (Order, dated July 13, 2001).) The order approving the settlement and release became final on August 15, 2001, thirty days after being docketed. (Con Ed's Rule 56.1(a) Stmt. ¶ 12.)

On May 10, 2002, Con Ed first asserted the affirmative defense of release in this action. It raised the argument in the final pages of a motion for partial summary judgment that, among other things, sought to dismiss the third-party beneficiary shareholder claim, which was then being asserted by NU on behalf of its current shareholders. In an Opinion and Order dated March 14, 2003, this Court denied summary judgment in favor of Con Ed's release defense, having found "no evidence that Con Edison or NU intended the *Bro-*

*dy* settlement to have the preclusive effect advocated by Con Edison." *Consol. Edison,* 249 F.Supp.2d at 419. The Court also denied Con Ed's oral application to amend its Answer to NU's Counterclaim to assert such a defense without prejudice to Con Ed's filing a written motion to amend. *Id.* Con Ed was eventually allowed to amend its Answer to assert its "Twelfth Affirmative Defense of Release," and discovery on this issue followed, as authorized by this Court. (*See* NU's Rule 56.1 Stmt. ¶¶ 43–44.)

## III.

The motion and cross-motion for summary judgment now pending both involve the meaning and effect of the release in the Settlement Agreement, particularly with respect to whether the definition of "Released Claims" includes the claims asserted by NU and Rimkoski on behalf of NU shareholders allegedly injured by Con Ed's alleged breach of the Merger Agreement. "Released Claims" is defined to include "all claims that might have been or might be asserted that arise or potentially arise out of or relate in any way to the Merger Agreement." (Settlement Agreement § IV, ¶ 1.12.) Con Ed argues that the third-party beneficiary shareholder claim now being asserted by Rimkoski on behalf of himself and the putative March 5 Class are claims that relate to the Merger Agreement and that they thus are covered by the plain meaning of the release.[4] NU and Rimkoski argue that the release, if

read in light of the Settlement Agreement as a whole, plainly does not cover the $1.1 billion shareholder claim that arose while the settlement was being finalized. NU and Rimkoski also argue that extrinsic evidence clearly supports their interpretation of the release and that the *Brody* settlement, if read as broadly as Con Ed proposes, could not have been approved by Judge Chin under Rule 23 of the Federal Rules of Civil Procedure.

■ A release is a type of contract governed by principles of contract law. *See Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.,* 273 F.3d 509, 514 (2d Cir.2001); *Ackoff–Ortega v. Windswept Pac. Entm't Co.,* 120 F.Supp.2d 273, 282 (S.D.N.Y. 2000), *aff'd,* 46 Fed.Appx. 663 (2d Cir. 2002); *Zilinskas v. Westinghouse Elec. Corp.,* 248 A.D.2d 777, 669 N.Y.S.2d 703, 705 (1998). In determining the scope and validity of a release, courts should apply state law, and there is no dispute that New York law applies to the interpretation of the Settlement Agreement. *See Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993) (stating that even where release involves federal causes of action, courts should look to state law in interpreting agreements).[5] Under New York law, courts must "discern the intent of the parties to the extent their intent is evidenced by their written agreement." *Id.* (internal quotation omitted); *see also Golden Pac.,* 273 F.3d at 515 ("Under New York law, a release-like any contract-must

---

4. Con Ed acknowledges, however, that claims by or on behalf of NU shareholders in this action could only be barred with respect to shareholders who were also members of the *Brody* Class and who did not opt out of the settlement. Con Ed also does not argue that the release applies to any claims brought by NU on behalf of itself as the corporation. While the Court has dismissed NU's lost premium claim on behalf of current NU shareholders as third-party beneficiaries, that

claim, according to Con Ed, would also be barred, at least in part, by its twelfth affirmative defense of release.

5. As explained in prior decisions, this action was brought pursuant to the Court's diversity jurisdiction and the claims arising out of the Merger Agreement are governed by New York law. *See, e.g., Consol. Edison,* 249 F.Supp.2d at 399.

be construed in accordance with the intent of the parties who executed it."). Where a release is unambiguous, it must be enforced according to its terms without resort to extrinsic evidence. *See Ackoff-Ortega,* 120 F.Supp.2d at 282; *Zilinskas,* 669 N.Y.S.2d at 705. But where an agreement is ambiguous, the court may look to extrinsic evidence to determine the parties' intent. *Golden Pac.,* 273 F.3d at 517. Whether a contract is ambiguous is a question of law for the court, and if there is ambiguity, the meaning of the contract generally presents a triable issue of fact. *See id.* at 514–15.

■■ As a general matter of contract interpretation, the Settlement Agreement must be read "as a whole, and every part will be interpreted in reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.,* 100 N.Y.2d 352, 763 N.Y.S.2d 525, 794 N.E.2d 667, 670 (2003) (internal quotations omitted). More specifically, it is well established that the "scope of a release turns on the controversy being settled and the purpose for which the release was actually given." *ASI Sign Sys., Inc. v. Architectural Sys., Inc.,* No. 98 Civ. 4823, 1999 WL 553825, at *5 (S.D.N.Y. July 29, 1999); *see also Cahill v. Regan,* 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505, 510 (1959); *Hughes v. Long Island Univ.,* 305 A.D.2d 462, 762 N.Y.S.2d 401, 401 (2003). "[A] release may not be read to cover matters which the parties did not desire or intend to dispose of." *Cahill,* 184 N.Y.S.2d 348, 157 N.E.2d at 510, *quoted by Hughes,* 762 N.Y.S.2d at 401; *Tarantola v. Williams,* 48 A.D.2d 552, 371 N.Y.S.2d 136, 139 (1975).

Therefore, in interpreting the scope of the release in this case, the Court must begin with the fact that disposing of Count I of the *Brody* complaint was the purpose of the Settlement Agreement and the context in which the settlement was negotiat-

ed. As Section I of the Settlement Agreement states: "This Stipulation concerns the final settlement of the Count I claim and is intended to effect the final resolution and dismissal with prejudice of Count I of Plaintiffs' federal complaint and the dismissal of Con Edison as a defendant in the Litigation." (Settlement Agreement § I, at 6.) Section IV, which contains the terms of the settlement, similarly opens by explaining that "Count I of the Federal Litigation and the Released Claims shall be finally and fully compromised, settled and released, and that Count I of the Federal Litigation shall be dismissed on the merits and with prejudice...." (*Id.* § IV, at 8.) Count I "alleged that the Initial Proxy disseminated by the Defendants regarding Northeast's acquisition by Con Edison was materially false and misleading in that it failed to disclose material adverse information concerning the potential liabilities and other issues raised by Con Edison's operation of the Indian Point nuclear power plant...." (*Id.* § I, at 4–5.) In short, Count I concerned "alleged misrepresentations and omissions in the Initial Proxy." (*Id.* at 5.)

■ Understanding the subject matter of Count I is important not only as background to the purpose and context of the release. It is also important because, consistent with the principle of *ejusdem generis,* "the general words of a release are limited by the recital of a particular claim." *Herman v. Malamed,* 110 A.D.2d 575, 487 N.Y.S.2d 791, 793 (1985) (internal quotations omitted), *quoted by Kemp v. Perales,* 199 A.D.2d 320, 604 N.Y.S.2d 268, 270 (1993); *see also Vines v. Gen. Outdoor Adver. Co.,* 171 F.2d 487, 492 (2d Cir.1948) (Hand, J.) ("[I]n a release[,] words of general import, followed or preceded by words relating to specific claims, are, ceteris paribus, limited to the specific claims.") The

definition of "Released Claims" includes the

allegations, claims, and causes of action asserted against the Released Persons in the Federal Litigation, as well as claims that might have been or might be asserted that arise or potentially arise out of or relate in any way to the Merger Agreement, the merger of Con Edison and Northeast, the Initial Proxy and/or any of the transactions described in the Initial Proxy, other than those claims asserted in Count II of the Federal Complaint.

(Settlement Agreement § IV, ¶ 1.12.) The general phrase "potentially arise out of or relate in any way to the Merger Agreement," must thus be interpreted in light of the reference to the claims in the Federal Litigation-the Count I claims-and also in light of the references to "the merger of Con Edison and Northeast, the Initial Proxy and/or any of the transactions described in the Initial Proxy." (*Id.*) The specific exclusion of Count II, a breach of fiduciary claim based on NU's willingness to agree to the Merger Agreement's "termination fee" clause (*see id.* § I, at 5), further indicates what the parties intended to cover by referring to claims relating to the Merger Agreement or the merger.

█ Based on the full definition of "Released Claims" and the Settlement Agreement as a whole, the release is properly understood as covering the claims asserted in Count I, as well as any claims that NU or Con Ed made insufficient disclosures or breached any duties to shareholders in entering into the Merger Agreement, in agreeing to specific terms of the Merger Agreement, or in attempting to convince shareholders to approve the merger, particularly with respect to the Initial Proxy, but not including the Count II claims. The *Brody* Action, which was premised on the consummation of the merger, was the opposite of this action, which arose out of the merger's failure. Given the subject matter of the *Brody* Action and the timing of the settlement, which was reached in principle in 2000 and finally approved after this litigation began, the general release of claims that "might have been or might be asserted" (*id.* § IV, ¶ 1.12) cannot be read to apply to the breach of contract claim that had already been asserted in this wholly separate action. In context, the *Brody* settlement's failure to refer specifically to claims arising out of the merger's termination shows that the settlement simply was not intended to address those claims.

This understanding of the release and the parties' intent is further supported by looking at the consideration involved in the Settlement Agreement, which states:

In consideration of the settlement of Count I of the Federal Litigation and the Released Claims, Defendants have disseminated the Supplemental Proxy containing the disclosures that Plaintiffs contended should have been included in the Initial Proxy and mailed directly to shareholders of Northeast and Con Edison in advance of the scheduled shareholder votes and meetings. It is Plaintiffs' contention that the information disseminated in the Supplemental Proxy was vital in assisting shareholders with casting their vote on the proposed merger.

(Settlement Agreement § IV, ¶ 2.1.) This passage confirms that the bargain of the settlement was to protect shareholders from voting on the merger without complete information while protecting Con Ed and NU from any further allegations that they had provided insufficient disclosures or that they were breaching any duties by entering into the merger. The consideration plainly relates to the creation of the merger, not its failure, and the Supple-

mental Proxy-which had been provided in April 2000–makes no sense as the sole consideration for the release of a billion-dollar breach of contract claim that arose in March 2001. Indeed, Con Ed conceded at the argument of the motions that there was no consideration for any members of the *Brody* Class for releasing any of the claims in this case. (Aug. 14, 2004 Tr. at 40.) It is inconceivable that sophisticated parties informed by counsel would bargain away such a claim without any monetary consideration, and the terms of the release cannot reasonably be read to require such a result. *See Best v. Yutaka,* 90 N.Y.2d 833, 660 N.Y.S.2d 547, 683 N.E.2d 12, 13 (1997) (reversing summary judgment dismissing personal injury claim based on release where consideration was "more consistent with the value of the plaintiff's automobile that with a personal injury claim"); *Tarantola,* 371 N.Y.S.2d at 139–40 (looking at consideration in determining that general release should be limited to "the claims specifically bargained for and all claims reasonably related to the bargained items").

Finally, the definition of "Released Claims" should also be read in connection with the definition of the class certified for the settlement, which consisted "of all public shareholders of Northeast who were eligible to vote at Northeast's special shareholders meeting on April 14, 2000 (the 'Class' and 'Class Members')." (Settlement Agreement, § IV, ¶ 2.1.) The *Brody* Class thus consisted of shareholders who were in a position to approve or reject the merger, confirming that the release related to injuries that could be suffered, and claims that could be asserted, by that class: for example, disclosure claims or claims for breach of fiduciary duty. The definition of the *Brody* Class is unrelated to any potential class of shareholders who would be able to collect damages for Con

Ed's alleged breach of contract, a claim that only accrued in March 2001.

Moreover, as Con Ed admits, even under its interpretation of the release, shareholders who acquired NU stock after April 14, 2000 (or who were not entitled to vote at the April 14, 2000 meeting) would still be able to pursue their third-party beneficiary claims for breach of contract. Con Ed's interpretation of the release cannot be reconciled with the Settlement Agreement's expressed intent that "the Released Claims shall be finally and fully compromised, settled and released." (Settlement Agreement § IV, at 8.) The *Brody* Class was not in a position fully and finally to compromise, settle, and release the breach of contract claims asserted against Con Ed in this action.

The meaning of "Released Claims" and the intent of the parties, as expressed in the language of the Settlement Agreement itself, are unambiguous. The release does not cover the third-party beneficiary shareholder claims asserted in this action, and Con Ed's Twelfth Defense of Release should be dismissed as a matter of law.

## IV.

Even if the terms of the release were considered ambiguous, NU would still be entitled to summary judgment dismissing Con Ed's "release" defense. Although the intent of the parties in entering into an ambiguous contract is generally an issue of fact for trial, a court may resolve contractual ambiguity as a matter of law "if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153, 159 (2d Cir.2000). In this case, the extrinsic evidence overwhelmingly confirms that the parties did not intend to release, for no

monetary consideration, the $1.1 billion claim now at issue.

It is clear that the lawyers for the parties in the *Brody* Action never discussed or even considered the effect of the release on the claims asserted in this action. For example, counsel for the *Brody* plaintiffs stated that the subject of the $1.1 billion breach of contract claim "never came up, never occurred us.... [W]e were settling [ ] disclosure claims and we were settling claims in the context of a merger which was going to take place. We were not settling claims of a merger that didn't take place." (Tr. of Dep. of Joseph H. Weiss, dated Nov. 3, 2003, at 15, attached at Sacca Decl. Ex. 29.) Counsel for Con Ed in the *Brody* Action, when asked at his deposition whether he had believed that the release would compromise any claims brought by NU against Con Ed, similarly stated: "I don't believe I had given the matter any consideration." (Tr. of Dep. of Robert H. Baron, dated Aug. 14, 2003, at 49–50, attached at Sacca Decl. Ex. 6.) Counsel for Con Ed explained that he was not advising Con Ed with respect to its dispute with NU relating to the termination of the Merger Agreement. (*Id.* at 50.)[6]

Particularly in the context of a $1.1 billion claim, the failure of the *Brody* parties to discuss or even consider the impact of the release on this action clearly demonstrates that they did not intend for the release to be as broad as Con Ed now claims. *See Tarantola*, 371 N.Y.S.2d at 139–40 (limiting scope of release to "claims specifically bargained for and all claims reasonably related to the bargained items" and rejecting assertion that release covered claim "neither bargained for nor discussed"). The likely reason that none of the sophisticated counsel even contemplated the impact of the release on this action is that the *Brody* Action and this action are wholly separate, with one premised on the consummation of the merger and the other premised on its failure. The definition of "Release Claims" was, in relevant respect, drafted in July 2000, well before the merger was in jeopardy. (*See* Gueli Decl. Ex. 4.) While it is undisputed that the parties intended the release to cover more than the Count I claims actually asserted-such as other disclosure claims-the release cannot reasonably be construed to preclude the claims asserted in this litigation.

This conclusion is only confirmed by Con Ed's failure to raise its "release" defense until over a year after the Settlement Agreement was formalized and nine months after it became final. When Con Ed ultimately did raise the issue, it did so only in the final two pages of a forty-page summary judgment motion. The failure to raise the defense earlier is persuasive evi-

---

**6.** Con Ed's then-General Counsel now claims to have thought in March 2001 that the release "does give us something additional and an additional increment of protection against stockholder claims," even though he also claims (consistent with another of Con Ed's defenses in this case) that there was "an iron-clad defense to stockholder claims by NU in the breakup of the merger which was a third-party beneficiary language which was clear." (Tr. of Dep. of John McMahon, dated Sept. 5, 2003, at 13, attached at Gueli Decl. Ex. 40.) The General Counsel claims only to have discussed this with another attorney in Con Ed's legal department who does not recall the conversation. (*Id.* at 16.) In any event, there is no evidence that this alleged thought was ever communicated to any of the lawyers negotiating the release or to anyone representing NU or the shareholders. Unexpressed intentions, particularly when inconsistent with the actual document that is executed, are of no weight. *See Tarantola*, 371 N.Y.S.2d at 139 ("Of course, the subjective notions of parties to contracts do not determine the legal rights and duties created by a writing of the agreement.").

dence that the Settlement Agreement was never intended to affect this action and that Con Ed's interpretation of the release was contrived for this litigation. *See W. Alton Jones Foundation v. Chevron U.S.A., Inc.*, 97 F.3d 29, 34 (2d Cir.1996) (finding that delay in asserting release defense was "powerful evidence" that settlement did not bar claims at issue and that party asserting release had merely "contrived that theory long after the fact"); *Best*, 660 N.Y.S.2d 547, 683 N.E.2d at 13 (noting defendants' failure to raise release defense in initial answer as further reason not to dismiss complaint based on release); *Stone v. Aronwald & Pykett*, 275 A.D.2d 706, 713 N.Y.S.2d 198, 200 (2000) (finding that release of federal action was not intended to preclude pending state court action where parties continued to litigate state court action after release was executed).

### V.

Finally, the release was part of a settlement in a class action suit, and if the release were as broad as Con Ed now claims it is, the Settlement Agreement would not and could not have been approved as fair and reasonable. Under Rule 23(e) of the Federal Rules of Civil Procedure, a court "may approve a settlement ... that would bind class members only after a hearing and on finding that the settlement ... is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). "In exercising its discretion under Rule 23(e), the Court must analyze the evidence and circumstances before it independently and objectively to determine whether the settlement is in the best interests of the class." *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F.Supp. 1099, 1103 (S.D.N.Y.1989).

The fairness of a settlement depends on both the history of the settlement's negotiation and its substantive terms, including the reasonableness of the consideration in light of the plaintiffs' best possible recovery and the complexities and risks of the litigation. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85–86 (2d Cir.2001); *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 648, 2001 WL 170792, at *5–*6 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42 Fed.Appx. 511 (2d Cir.2002). In this case, the consideration of the *Brody* Settlement was the distribution of the Supplemental Proxy statement in April 2000, almost a year before the Settlement Agreement was finally executed. While that consideration was reasonable with respect to claims arising out of the consummation or approval of the Merger Agreement, it is plainly not fair, reasonable, and adequate with respect to the release of breach of contract claims in this action. Indeed, at the argument of these motions, Con Ed conceded that releasing the billion-dollar breach of contract claim for no monetary consideration would not be fair and adequate. (*See* Aug. 14, 2004 Tr. at 40.)

Moreover, courts must take "special care" when a class action settlement purports to release claims "not asserted within [the] class action or not shared alike by all class members." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir.1982); *see also Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir.1981) ("An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class."). The *Brody* Class was defined as NU shareholders who were entitled to vote at the April 14, 2000 special meeting, and with respect to a potential release of the shareholder breach of contract claims, there would have been two subclasses with

differing interests: Class Members who sold their shares prior to Con Ed's alleged breach on March 5, 2001, and Class Members who had retained their shares through March 5, 2001. While the first subclass had no interest in the breach of contract claim and was fully satisfied by accepting the Settlement Agreement in exchange for the Supplemental Proxy, the second subclass would have released their share of the billion-dollar breach of contract claim for no additional consideration and no monetary consideration whatsoever.

■ In such a situation, a court should "decline[ ] to permit the uncompensated release of claims resting on a separate factual predicate from that settled in the class action." *TBK,* 675 F.2d at 462 (describing claims as based on separate factual predicates when they not only depend "'upon a different legal theory but upon proof of further facts'" (quoting *Super Spuds,* 660 F.2d at 18 n. 7)). The *Brody* Action and this litigation are clearly based on separate factual predicates, with the *Brody* Action predicated on the consummation of the merger and this action predicated on its failure. Therefore, under the law in this Circuit, the *Brody* settlement could not have been approved if the release were as broad as Con Ed now claims. Not only was the settlement approved, but it was approved with absolutely no inquiry by the court or the parties into whether, for example, the *Brody* Class representatives were adequate representatives for the release of the breach of contract claims.[7]

■ In addition, the *Brody* Class did not receive adequate notice of the release of any claims for breach of the Merger Agreement. "Due process requires that the notice to class members 'fairly apprise the ... members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.'" *Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1079 (2d Cir.1995) (alterations in original) (quoting *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir.1982) (internal quotations omitted)). The Notice approved and mailed out to the *Brody* Class explained, in relevant part, that the Class was releasing claims relating to the Merger Agreement that "might have been or might be asserted." (*See* Notice § III, ¶ 4). The Notice did not mention that the merger had been terminated or that claims had already been asserted by NU on behalf of its shareholders arising out of the alleged breach of Merger Agreement. Indeed, the Notice stated that "Plaintiff Adele Brody has concluded ... not to further challenge Merger and not to further pursue this litigation." (*See* Notice § I, ¶ 1.) The only reference to this action was in a cover letter from NU included with the Notice. That letter advised that the merger had been called off and that the lawsuits had been filed with respect to

7. At the argument of the motion the parties stated that nothing in the *Brody* Action record reflects whether Adele Brody was an NU shareholder on March 5, 2001. (*See* Aug. 13, 2004 Tr. at 9, 41–42.) Without such information, the court could not have approved the settlement because Brody would not have been an adequate representative for the release of a claim that she did not possess. Also, a main issue in the settlement negotiations involved attorneys' fees for the *Brody* Class counsel, and there would have been serious concerns that the Class counsel was using the release of claims in the separate action to increase the settlement with respect to their fees. There was no inquiry into either of these potential problems. As explained below, the lack of any inquiry, rather than casting doubt on the settlement's validity, is further evidence that neither the *Brody* parties nor Judge Chin intended or understood the settlement to have the effect Con Ed now asserts.

the merger's termination, but the letter certainly did not imply that those lawsuits were being settled. To the contrary, it indicated that they were "still pending." (*See* Letter from Michael G. Morris, NU Chairman and Chief Executive Officer, dated May 11, 2001, attached at Sacca Decl. Ex. 4 at CRV 0000976.) It is also undisputed that the letter was among the documents provided to Judge Chin for approval as part of the notice of settlement to be sent to Class Members. (*See* NU's Rule 56.1 Stmt. ¶¶ 36–37; Con Ed's Rule 56.1(b) Stmt. ¶¶ 36–37.) Particularly because the settlement and the definition of the Class were unrelated to the failure of the merger, the Class Members had no reason to believe, and were not "adequately alerted to the possibility," that they would also be releasing claims in this action without consideration. *See Super Spuds,* 660 F.2d at 20. Had the notice been adequate, there almost certainly would have been objections to the uncompensated release of claims in this action, but there were no objections at all.

Because of its unreasonableness and lack of adequate notice, the Settlement Agreement could not be valid, and the release could not be enforced in this action, if the release has the meaning that Con Ed now asserts that does. The validity of the Settlement Agreement, however, is not actually in doubt. Instead, Judge Chin's approval of the settlement as fair, reasonable, and adequate simply is further evidence that Con Ed's interpretation of the release was contrived long after the fact for the purposes of this litigation and does not reflect the intent of the parties entering into the *Brody* settlement. As Judge Chin noted at the settlement-approval hearing, "the settlement simply consist[ed] of the fact that after the plaintiffs filed the action ... the defendants agreed to send out a supplemental proxy." (July 2001 Tr. at 2.) "[T]he supplemental proxy having served its purpose" of ensuring ad-

equate disclosure for NU shareholders, the only question left was attorney's fees. (*Id.*) The release of the claims then-pending in this litigation would have plainly raised serious questions as to the fairness of the settlement, the adequacy of Class representation, and the adequacy of the Notice, but those questions were not addressed by Judge Chin nor raised by the attorneys. The reason for this is obvious: None of the parties involved in the *Brody* settlement intended that it would release any claims in this action, and no one, whether connected to the *Brody* Action or otherwise, could reasonably interpret the Settlement Agreement as releasing the shareholder breach of contract claims.

### Conclusion

NU's motion for summary judgment dismissing Con Ed's Twelfth Defense of Release is **granted.** Con Ed's cross-motion for summary judgment is **denied.**

**SO ORDERED.**